Chief Judge Richmond, Judge Jones, Judge Ho, my name is Phyllis Glazer. I am here on behalf of Nurse Leslie Wheat, Nurse Paula Stringer, Nurse Robin Bowman, and Dr. Casey McVay, who is Dr. McVay, just to make it easier. This is a deliberate indifference to serious medical needs case arising under the Eighth Amendment, and as this Court has held, imperfect treatment does not equal denied treatment. The Eighth Amendment prohibits prison officials and prison doctors and nurses from denying an offender medical treatment, intentionally treating him incorrectly, evincing wanton disregard to serious medical needs about which they knew. The Eighth Amendment prohibits the unnecessary and wanton infliction of pain, and so several cases hold that providing pain medication to an inmate with complaints of pain is not deliberate indifference. It evinces the opposite. How old is Mr. Spikes? Now he's about 50, so he was in his mid-to-late 40s at the time, I think. Sorry, mid-to-late 30s at the time. 30s, okay. Yeah, my math is, once you cross over 40, I stopped counting, so yeah, mid-to-late 30s at the time. So Mr. Spikes had a fractured femur, which was also described as a hip injury or a leg injury. It's a bone of the leg. It is a bone of the leg, and it's attached to the hip. There's a song and everything. But they didn't know that he had broken his hip. He didn't have a fall. He didn't have a traumatic injury. He was exercising and felt pain and went in and complained about pain, and between the first time he complained and the time he received surgery, it was six weeks, and that six weeks including the four days after he went to the hospital when they said, you know, we'll operate on you in four days. Mr. Spikes sued some of the nurses who examined him, none of whom examined him more than twice, and the doctor who oversaw the nurses for the treatment that he received before his surgery. He did also sue about the treatment he received afterwards, but those claims were properly dismissed because they did not amount to deliberate indifference, and neither did the treatment he received before. The plaintiff may allege that these nurses denied him medical treatment or that they treated him incorrectly. They're definitely alleges. How many of the, I think there are, what, four or five nurse visits that are at issue here? Yeah, I think five, yeah, four or five in a six-week period. And how many of those did Dr. Wheat make comments after the fact? Dr. McVeigh. I believe all of them. There was one visit where he actually spoke to the nurse, so I'm not sure if he wrote anything separately after. But my point is that those nurses were under medical supervision the whole time. Oh, yes, absolutely. And in fact, that's part of the claim is that they didn't call Dr. McVeigh fast enough and expressed to him the urgency of the situation, which is a matter of professional judgment, is a dispute with the medical treatment provided. None of these nurses or Dr. McVeigh denied him treatment. They never examined him and then didn't provide him some kind of treatment. And this Court has held an ice pack is medical treatment. Instructions not to exercise, you know, a bottom bunk duty status, pain medication. To the extreme, if someone were bleeding profusely, providing an ice pack would not be treatment. Correct. That would be an example of intentionally treating a known condition incorrectly. The example that I got when I was learning all of this for the first time a few years ago was a compound fracture with the bone actually sticking out of the skin. And if the nurse gave a Band-Aid and a baby to aspirin, that would be, that would evince wanton disregard for serious medical needs. But that's not what happened here. What happened is you have... You're not getting to his actual complaints, which were he couldn't walk. He had these crutches or a crutch. Right. Yeah. He complained of pain. He said he couldn't walk. When she told him to weigh himself, he couldn't get to the scale. He had to hop over there. Right. That's what he, yes, that's what he claims happened. All of the nurses reported that he came into the wheelchair in a, I mean, he came into the infirmary in a wheelchair. More than one of the nurses actually prescribed him crutches to aid with mobility. There was another case out of this Court. There was an unpublished case involving an offender who actually needed a hip, a full hip replacement, had a diagnosis and an order for hip replacement, but for various reasons he couldn't get it at the time. And so knowing that he couldn't get the surgery, the prison provided him pain medication, a wheelchair, and other mobility aids. And they did, you know, they did what they could to treat his symptoms, which is the same thing they did here. They gave him mobility aids, the crutches, the wheelchair, pain medication, analgesic balm, gave him a limited duty status, eventually a no-duty status, and then he did see the doctor and then went to the hospital and had surgery. I mean, this is not disregard. They didn't ignore him or intentionally treat him incorrectly. The argument here is focused on the notion that at least after the first visit, so just, you know, two through six or two through five in those first weeks, the nurses and doctor should have known that his condition went from potentially not serious to serious, posing a substantial risk of serious harm, requiring an X-ray. Even if that's true, that's negligence, and that's not just my opinion. I am not a doctor. That's the opinion of the United States Supreme Court in Estelle v. Gamble. The decision to not provide an X-ray sooner is not deliberate indifference. What about the allegation of deliberately not taking the right notes in terms of reporting what he complained about? Right. Ms. Stringer, the one nurse. Hypothetically, you can imagine a situation where if somebody wanted to be one, they could simply not report the complaints and try to bury the incident that way. Yes, that would be. Why is that not subject for trial? That's the gatekeeper issue, right? The nurses are the gatekeepers to the doctor and all that, so there are certainly cases that say that if the nurse intentionally prevents the offender from seeing the doctor, that could have been deliberate indifference and an intentional delay or whatever. For one thing, starting at the end, that didn't happen. I mean, I'm not talking about a dispute of fact. I'm talking about the effect of the delay. Assume that it's true that Nurse Stringer lied about his range of motion and lied about his ability to walk and lied about the extent of his pain on the form. I mean, she reported that he complained of pain but not enough pain. Eight out of ten, right? Yeah. Well, that's pretty high. I agree. I mean, that couldn't be a lie. Right. I'm not going to disagree with that, Judge. Assuming all of that's true, the next day he went back and saw a different nurse, who's not a defendant now, who spoke with Dr. McVeigh and is not alleged to have lied about anything. And so, you know, there's just no causation. There's no causation, exactly. And that was the last time that she allegedly lied about the range of motion and the level of pain in Nurse Stringer. That was the last time she saw him before he had surgery. And then there's Dr. McVeigh. Dr. McVeigh reviewed the nurse's notes. One of the cases that was emphasized in briefing was Stewart v. Murphy, in which the doctors were found to not be liable despite that they didn't read the nurse's notes. And so they said they didn't know the extent of the inmate's condition because they didn't read the nurse's notes. Well, Dr. McVeigh was reading the nurse's notes. That's not an indication that he was being indifferent to Spikes or any of the other offenders. And, you know, he read the nurse's notes. He testified in his deposition that he considered not only the subjective complaints of pain but other objective indicators of pain, such as elevated heart rate and things like that, and determined that it wasn't necessary at that point to elevate him to an emergency status. This includes his conversation with Nurse Williams, I believe. And Dr. McVeigh made an informed medical decision to keep him on the normal appointment calendar, and he kept his appointment. I mean, some of the significant things that did not happen here. He was not taken off of the appointment book. He was put on it, and he kept his appointment. They didn't elevate him at any point, but that's not deliberate indifference. That's maybe negligence, maybe. Dr. McVeigh, once he did see him and looked at his X-ray, sent him to the hospital. And yet the argument is that Dr. McVeigh was deliberately indifferent before that because he didn't see him, but that's not, again, not deliberate indifference. The cases from Estelle on down, including recent cases from this court, like Petzold v. Rostolan, Gobert v. Caldwell, or Gobert, depending on where you're from, and even Harris v. Hegman and all of these cases, Easter v. Powell, Domino, they do not support that what these nurses and these doctors did with regards to the repeated evaluations of this offender, the treatment they provided, albeit ineffective, even if the treatment, the evaluations were allegedly perfunctory and inadequate, as this court said in Petzold, not deliberate indifference. So for that reason, we would ask that the denial of summary judgment be reversed. I've got a couple minutes left. Well, separate from the five afterwards, but there was an issue about the mandate rule and whether or not the original panel opinion, which was then vacated on rehearing, was actually vacated on rehearing. It is our position that, of course, it obviously was, even though the panel on rehearing didn't use the word vacated in reference to the original opinion. The panel on rehearing completely changed its conclusion, and for that reason, the rehearing opinion, not the original one, was attached to the judgment entered as mandate, and it was the opinion on rehearing which remanded it for consideration of the whole qualified immunity defense, not just a select part of it, is what was put into the district court's record. So I think the application of the mandate rule is pretty straightforward here in that even though the original panel didn't specifically say the words that they were vacating their earlier ruling, they certainly did by effect, and even Westlaw has a red flag on it. So with that, I will see you for five more minutes. Thank you. Thank you. Good morning, Your Honors. My name is Elizabeth Cumming, and I represent Lars Spikes in this matter. On June 30th, Mr. Spikes suddenly lost the ability to walk. After he had been wheeled up to the infirmary, he told Nurse Stringer that he felt like he had been hit by a hammer in his right leg. For the next month and a half, Mr. Spikes could not walk. He experienced intractable excruciating pain, and he repeatedly asked for emergency medical care. It wasn't until six weeks later on August 11th that Dr. McVeigh saw him, ordered an X-ray, and determined that Mr. Spikes had broken his hip. Because of this delay, Mr. Spikes had to undergo a complex surgery in which surgeons had to re-break his hip because it had fused improperly over the last six weeks. Dr. McVeigh acted directly contrary to his own medical judgment based on his testimony, and the three defendant nurses did not follow Rayburn's procedures for providing medical care. Explain to us how that elevates the case from medical malpractice into deliberate indifference. So looking at the district court's ruling, I think one thing it's worth keeping in mind is that the district court's assessment of the factual landscape is what controls here, and under Farmer, subjective deliberate indifference. Well, this is summary judgment, right? Yes, Your Honor. So the only question is whether there are material fact issues. But, I mean, as far as we're not controlled by facts in that instance, we're looking at the legal question here, specifically here, about whether the facts taken in the light most favorable to the plaintiff can be construed as deliberate indifference under the Eighth Amendment and then whether it was every reasonable medical person would have known that he or she was committing a constitutional violation. Yes, Your Honor. The question of whether or not the rights that the defendants are deemed to have violated, misrespects rights, were, in fact, clearly established at the time. And looking at this court's jurisprudence, pointing to Harris v. Hedgeman, I think is a helpful guide. In Harris, you had patient Harris who was coming before two nurses and a doctor with reports of excruciating pain. The nurse, the first nurse that Mr. Harris saw, scheduled him for a routine dental appointment. The second nurse said, you already have a routine dental appointment. A doctor, in fact, evaluated Mr. Harris and took no further action. And that was only a delay of a week before it was discovered that he had, in fact, refractured his jaw. That delay of a week was found by this court to constitute, to state a claim for deliberate indifference. Here, what we have is the district court found that Dr. McVeigh was subjectively aware that there was a substantial risk of harm to Mr. Spike's health. And Dr. McVeigh didn't take a reasonable response to that subjective, serious risk of harm. Dr. McVeigh testified that, in his understanding, muscle strain would resolve within a week, at most two weeks. He knew that Mr. Spike's had been experiencing excruciating pain from June 30th, and he took no steps to evaluate Mr. Spike's. Dr. McVeigh also testified that his understanding of how you provide treatment is you treat, then you evaluate. That evaluation is an in-person assessment of the patient, how they're responding to whatever is happening, and then you modify. So what you're saying is that there was a distance of approximately six weeks between the injury and the surgery? It ended up being a little bit more than that. I think the surgery didn't end up being scheduled until about a week after, which I understand is outside of the- So seven weeks, six weeks, seven weeks, okay. So once they decided if they thought it was muscle strain, then it's really a question of five weeks when the muscle strain should have eased up, right? Yes, Your Honor. So five weeks, and that eliminates at least the first nurse visit, maybe the second nurse visit. There is a question of fact about whether or not Nurse Stringer's failure to document what was actually before her, Mr. Spike's symptoms of his inability to walk and his extreme pain. There is a question of fact about whether or not that- Well, eight out of ten is pretty extreme. Yes. I mean, we've all been in and around hospitals, and people just don't say eight out of ten. It's very difficult for me to characterize that as evidence of deliberate indifference. In the second visit on July 5th, Nurse Stringer knew that he had been experiencing this extreme pain- That's six days after. Yes, Your Honor. Look, I've had a serious muscle pull for which I had to go to bed, and I was approximately the same- Actually, I was older than Stringer at the time, and whatever my level of injury, I had a very tough time walking. So, again, I don't see that as a matter of- The initial two weeks, I do not see as a matter of deliberate indifference. I think that's very difficult. Yes, Your Honor. I understand. But subsequent to that two weeks- But Stringer's out of the picture after two weeks, right? Yes, Your Honor. Okay. Again, Dr. McVeigh was aware that Mr. Spikes continued to not have the ability to walk, and Nurse Williams- She's referred to as both Williams and Wallace. She's a non-defendant nurse here. She saw Mr. Spikes on July 6th. To her, she was concerned enough. His medical need was serious enough and obvious enough to her that she actually abided by Rayburn's policies and procedures for emergency medical care, called Dr. McVeigh, and expressed her concerns. She also included in her note that Mr. Spikes could not walk. So we're not talking about a difficulty in walking. We're talking about he could not bend his leg, he could not put any weight on it, he could not walk, and that after taking so much Advil that he was experiencing gastrointestinal distress even, he was not feeling any kind of relief from this intractable pain. So Dr. McVeigh was certainly aware, at least as early as July 6th, that something might be happening. I take the court's position that the first two weeks, especially given Dr. McVeigh's position that muscle strain could last as long as two weeks, might be out of the frame here. But what we have is we have another additional four weeks beyond that in which Mr. Spikes is continuing to experience an inability to walk, and Dr. McVeigh is aware of that inability to walk. When he comes up and he sees Nurse Bowman and Nurse Wheat, he is also, both of these nurses are aware that Mr. Spikes has been unable to walk for the last three weeks. Well, how was he going to the bathroom during this time? Did they inquire about that? I don't believe they did. I mean, that would have meant he couldn't go to dine. They took him off work requirement, but there's nothing in the record about his being so impaired that he couldn't do daily tasks, right? Mr. Spikes testified about the requirement to make his bed, and he said that he tried his best to make his bed. He would try and hop on one leg, but that even that was impossible for him to do. Well, I'm not really disagreeing that a broken femur is a very serious thing. I'm just wondering the extent to which the human body is mobile under those circumstances. The idea that he could get up and twist around and make a bed implies some level of ongoing mobility. Yes, he was able to move. He was not paralyzed, and with the help of a wheelchair, in his testimony, he talks about the assistance of other inmates on the dorm with him. With assistance, yes, he was able to move, but we're talking about, and just a small fact correction, he was in his mid-40s at the time that this occurred. This is a gentleman who is in his mid-40s who very suddenly, in the course of minutes, goes from being an active person who can walk to a person who requires constant assistance to move, who cannot walk on his own. I mean, again, the age of the prisoner does not lead to a natural inference that he's somehow broken a major bone just shooting hoops. Well, looking at Harris versus Hedgman, there was not anything that could give the nurses or the doctor any kind of inference that they knew that his jaw had rebroken. But part of what Harris is looking at is the fact that Mr. Harris is presenting with symptoms of a very serious illness, and the symptoms of that serious illness are not being responded to. So as a result, I think the jurisprudence of this court, and our position is the jurisprudence of this court, says you don't necessarily have to have the diagnosis fixed. What the expectation is is that medical professionals respond to the symptoms that are before them. Was there any evidence in the record about what it might have been other than a broken femur? There were a couple of possibilities. Nurse Stringer first indicated she didn't document a full assessment. Nurse Stringer just documented in the assessment section muscle strain. And so muscle strain was one possibility. And I believe when Dr. McVeigh saw Mr. Spikes, he had two possible diagnoses that he was considering. One was an inguinal hernia. The other was possibly a fracture. He sent Mr. Spikes for an X-ray. As soon as he saw Mr. Spikes, he sent him for an X-ray. In his medical judgment, as soon as he assessed Mr. Spikes, he understood the need for further diagnostic testing, which he engaged in, and that was how they discovered that the hip had been fractured. The fact that Dr. McVeigh knew that Mr. Spikes had had this inability to walk, unassisted, and this infraction. Was there any other evidence, like from another third-party physician or any source, that this could have been something other than muscle strain? It was either muscle strain or a fracture. There's nothing else it could have been. Dr. McVeigh's testimony is that by the time you get to two weeks out with absolutely no improvement, if anything, Mr. Spikes was getting worse at two weeks out, muscle strain would be taken off of the differential diagnosis list based on Dr. McVeigh's testimony. Is there anything on the differential diagnosis list from any source that at that point it had to have been a fractured bone? Not that it had to have been a fracture, but fracture would have been included on the differential diagnosis list. What else would have been included is my question. Any number of things. What does the record say? Inguinal hernia would be the other thing that Dr. McVeigh was considering. Both would require significant medical intervention, possibly for, I'm not sure what the treatment is for an inguinal hernia, so I won't guess. Surgery. So both of these two differential diagnoses that Dr. McVeigh were considering after this two-week period are significant or serious, and yet he does not take the time to evaluate what is happening with Mr. Spikes until August 11th, six weeks after the first presentation. With regard to Nurse Wheat, the district court found that Nurse Wheat was aware of the serious risk of harm, and Wheat did not take steps that were responsive. What could she have done? She could have done a couple of things. The first is that she could have not disciplined him for seeking medical care. Wait a minute. What could she have done to relieve the situation? Could she have ordered an X-ray? There is a factual dispute about whether or not nurses could order an X-ray. There was X-ray that was available certain days of the week at Rayburn. The nurses say the doctor had to order it. Dr. McVeigh said the nurses could, under some circumstances, order it. It's a factual dispute. So possibly she could have. She also could have contacted Dr. McVeigh and expressed her concern that Mr. Spikes had not improved over the last three weeks, that this was not consistent with a muscle strain, and that something else was happening that required Dr. McVeigh's evaluation and assessment. The Supreme Court has consistently refused to decide whether circuit court precedent alone can furnish the basis for what's called clearly established law. Do you have any Supreme Court precedent other than the general statement of Farmer v. Brennan? So I would look also to Wilson v. Lane, which is a Supreme Court case in which the Supreme Court does acknowledge that circuit precedent can be used to. . . Well, you can say that, but in Westby, there's a footnote that very obvious, I mean, just states flat out. There are at least two, but there are a couple cases behind that that say we have not yet decided that. And I think if there is a case that provides sufficient factual analog, then the Supreme Court precedent clearly establishes the law. Short of that, Williams v. Lane suggests that the circuit court look to its own jurisprudence, and then if there is not sufficient law within its own circuit, Williams v. Lane instructs the circuits to look to a consensus of other circuits and persuasive authority. I thought Pearson v. Callahan, and this is just going totally from memory because this isn't really part of your all's briefing, but I thought Pearson said you don't normally look outside the circuit when you're talking about qualified immunity. You don't normally if there is a circuit precedent that the court determines is sufficiently factually analogous. But if the circuit determines that there isn't, then you can look to the consensus of law of persuasive authority, including other circuit cases. But you're saying somehow Wilson, you have to reconcile Wilson and Wesby, it seems to me. Yes, Your Honor. How do you do that? I look to Wilson. Well, okay. All right. Don't we have circuit precedent that answers this? Yes. Even assuming, as I think is accurate, that the Supreme Court has left this issue open, we haven't left the issue open. We've gone bonk.  Harris v. Hedgman is the circuit precedent that sets out that if you have someone who is coming to you with repeated complaints of excruciating pain, that you need to take steps to resolve that excruciating pain. So, yes, there is circuit precedent. In addition, I know that unpublished cases do not clearly establish the law. We're not saying that they do. But this Court has found that it does, unpublished cases can provide an apt illustration of the established right. And there we point to Ledesma v. Schwartz in which, in a similar scenario, you had a patient come to a doctor reporting excruciating pain and swelling. The doctor provided Motrin for five days and an X-ray after that. And this Court held that stated a claim for deliberate indifference. You would say, how would you articulate in this area that the clearly established law, is it based on excruciating pain or what? So, I'm sorry, may I answer the question? Yes, please. So Harris's articulation of the rule is that inadequate medical care by a prison doctor can constitute a constitutional violation when that conduct amounts to deliberate indifference to the prisoner's serious medical needs. And that includes an unnecessary and wanton infliction of pain. So when you have someone who is coming to you with repeated complaints of excruciating pain that are unresolved, the initial diagnosis that might have explained that pain, the time period for that has passed. It is unlikely that initial diagnosis or working diagnosis, but there is still no reevaluation of the patient. That states a claim for deliberate indifference. So pain alone is grounds for the Eighth Amendment, doesn't that tell? I don't mean to be too cynical, but doesn't that tell every prisoner that no matter what's wrong with him, he says, I have excruciating pain, I have excruciating pain? No, I don't believe so. Because if what is happening, so, for example, in the first two weeks, if there is an honest belief that what is happening is muscle strain that is supported by medical judgment and there is an effort to treat that muscle strain, that may not state a claim for deliberate indifference. Getting to my question a while ago, once you got past the two-week period, what else did they think it might have been other than a fracture? Inguinal hernia is the only other differential diagnosis in the record. With that, I see my time is up. So we respectfully request that this court affirm the district court's denial of the defendant's motion for summary judgment. Thank you very much. Thank you. In Harris v. Hegman, an offender with a broken jaw was brought to an outside facility for surgery for said broken jaw, which means his broken jaw had previously been diagnosed and was, you know, the prison doctors and stuff knew about it because they brought him to the doctor for surgery. Before he left that outside provider, he started complaining about pain, excruciating pain, and that his jaw was off, that it wasn't, a wire had broken or something. His jaw was still broken. He had just had the surgery, and I think what ended up happening, what they ended up figuring out, was that his jaw had dislodged after the surgery, and the wires had broken or whatever, something along those lines. So he made that complaint immediately after he woke up from the surgery, before he went back to the prison. He made it again within an hour of his arrival at the prison, and the people at the prison said, eh, you've got a follow-up on the docket. We'll give you, I don't even know if they gave him pain medication. What I do know is that they put him back on a regular food diet and sent him on his way until seeing somebody else a week later, and he got the treatment that he needed. That is unequivocally not what happened here. It's not. Mr. Spikes's complaints of pain were acknowledged and treated within the judgment of the doctor and the nurse. There's no discernible origin for a broken femur based on the fact that he had been lifting weights. Correct. I mean, unless he was doing the knee exercise. I mean, there's nothing in the record, right? Correct. There is nothing in the record, and there's no allegation that he reported anything differently. I mean, there was no use of force. There was no fall. There was no slip and fall. There was no work-related incident. This is the inmate who was exercising who, I don't know, got hurt and then came in and came in later. There's nothing in the record that supports the allegation that when he was exercising. Was he a drug addict? I don't know. That's not in the record either? I don't think so. I don't think so. And importantly, there's nothing in the medical record to indicate that his complaints were discounted because they thought that it was drug-seeking. I'm not saying it was drug-seeking. I have read that people who are drug addicts have decreased bone strength, osteoporosis. Yes. I was talking to my sister last night, and her first question was whether he was on dialysis. And I said, I don't know. I don't think so. Not at the time. I don't know. Well, they didn't check any of that out anyway. But there's also nothing in the record that indicates he has a prior history of broken or brittle bones or anything like that. Right. But these, well, going back to the issue y'all were just discussing, there is plenty of case circuit precedent on deliberate indifference to serious medical needs. There's plenty of circuit precedent on deliberate indifference in other contexts. When it comes to deliberate indifference to serious medical needs, several cases are, several circuit cases are exceptionally relevant here, including that Petzold case that I mentioned before. Harris is not one of them. And then cases dealing with delay, cases dealing with other orthopedic issues. And then there's Estelle versus Gamble. The answer to the question presented earlier is regardless of the unresolved Supreme Court issue about whether circuit precedent can clearly establish the law, in this case Estelle did. Estelle did. Estelle wasn't a leg or a hip. It was a back. But the complaint was about a delay, particularly delay in diagnostic testing. But in the meantime, the offender was given pain medication. He was evaluated and he wasn't ignored or intentionally treated incorrectly. There is no material dispute of fact about what these nurses and the doctor knew, nor was there an Eighth Amendment obligation for them to cure him. Their obligation was to acknowledge his pain and respond to it, and they did. With that, I ask that it be reversed. Thank you for your time this morning.